# UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| RONALD LAWSON and ANITRA LAWSON,<br><br>**Plaintiffs,**<br><br>v.<br><br>CHEATHAM COUNTY, TENNESSEE; CITY OF PLEASANT VIEW, TENNESSEE; CHEATHAM COUNTY SCHOOL DISTRICT; JOHN/JANE DOE 1-5; and JOHN/JANE DOE 6-10,<br><br>**Defendants.** | Case No.<br><br>**Jury Demand** |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

COMES NOW, Plaintiffs Ronald and Anitra Lawson ("Plaintiffs"), by and through counsel of record, Leonard Lucas, and for this Complaint against the Defendants, Cheatham County, Tennessee, the City of Pleasant View, Tennessee, Cheatham County School District, John/Jane Doe 1-5, and John/Jane Doe 6-10 and respectfully shows this Court as follows:

### I. JURISDICTION AND VENUE

1. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the events giving rise to this action occurred in Cheatham County, Tennessee.

## II. PARTIES

4. Plaintiffs are residents of Cheatham County, Tennessee and owners of real property located at 1134 Shahan Road, Pleasant View, Tennessee.

5. Defendant Cheatham County, Tennessee is a local governmental entity subject to suit under 42 U.S.C. § 1983.

6. Defendant City of Pleasant View, Tennessee is a municipal corporation subject to suit under § 1983.

7. Defendant Cheatham County School District is a political subdivision subject to suit under § 1983.

8. John/Jane Doe 1–5 are individuals employed by one or more governmental Defendants who participated in drainage decisions, approvals, or modifications that caused the flooding. They are sued in their individual capacities.

9. John/Jane Doe 6–10 are individuals who participated in the design, approval, or implementation of stormwater modifications and are sued in their individual capacities.

10. Plaintiffs will amend this Complaint to identify John Doe Defendants upon discovery.

## III. FACTUAL BACKGROUND

11. On March 11, 2020, the Plaintiffs obtained the building permit for their house, with the current address of 1134 Shahan Road, Pleasant View, Tennessee 37146 ("Property").

12. The Property includes the Plaintiffs home, land, and shop.

13. As a result of the 2010 floods, in the area, the Federal Emergency Management Agency ("FEMA") revised the flood zones for Cheatham County.

14. The Property was not deemed a flood zone by FEMA.

15. Plaintiffs constructed a residence within a 380-acre closed drainage basin under the overlapping jurisdiction of Cheatham County, the City of Pleasant View, and the Cheatham County School District.

16. The basin has no outlet system, and historically, flooding has been documented as far back as 1955.

17. Plaintiffs were unaware that they were building in a closed drainage basin, and the history of flooding.

18. Across from the Property sits a large 4.7-acre swamp.

19. During rain events, stormwater accumulates in the swamp area, floods the public road between the swamp and the Property, then the Plaintiffs' neighbors' yard, and then the Property.

20. Prior to building, the Plaintiffs were unaware of the flooding from the swamp area, and no one with Cheatham County informed them of the flooding, even though, according to neighbors, Cheatham County employees and agents would place traffic cones to block off the public road, in front the Property, after heavy rains, due to flooding.

21. Throughout the construction process, inspections were performed by Cheatham County Codes officials, who never indicated or documented any limitations regarding the house location on the lot or the construction method.

22. On October 2, 2020, the Certificate of Occupancy was issued by Cheatham County.

23. Had there been any failures to comply with zoning regulations, the county building officials would not have approved the house for occupancy.

24. The issuance of the certificate proves that the County approved the house construction and allowed occupancy of the home.

25. Before issuing the building permit or the Certificate of Occupancy, no county employee or agent responsible for approving the building permit or issuing the Certificate of Occupancy informed the Plaintiffs that they were building in an area with a documented flooding history.

26. Despite the decades-long history of flooding, Cheatham County approved construction, issued permits, and allowed occupancy of the home in a known flood hazard area.

27. Plaintiffs' land often had standing water after heavy rains, and as Plaintiff understood it, the Property was not in a flood plain.

28. Plaintiff took several measures from the year 2020, to mitigate what they believed to be drainage issues, including but not limited to building the slab up 2' and graded out, installing a huge 10" drain by the driveway that pipes out 300' to a large industrial size French drain pipe and grading for that spot, seeding and straw, graded rest of the yard toward the road, and shot grade and adjusted the yard to be 3" above lowest spot out by the road.

29. On February 16, 2025, the Property flooded, putting approximately 3 inches of contaminated stormwater into the Plaintiffs' home.

30. Plaintiffs discovered their house was flooding at 2 am when Mr. Lawson stepped in water on his way to the bathroom.

31. Plaintiffs checked the rest of the house, and the water was already moving into the guest room and their daughters' room.

32. Plaintiffs checked their son's room, which was near the garage, and it had already flooded, with approximately 3 to 4 inches of water.

33. Plaintiffs moved as many of their documents and valuables to the beds and other elevated areas.

34. Plaintiffs could hear the toilets backing up because the floodwater was also flooding the septic system.

35. As the Plaintiffs left their Property for a hotel, the entire house flooded, and the driveway appeared to have 6 inches in some spots.

36. When they returned to the house that morning, their dream house, which they had designed and built together, had been totally devastated.

37. The home was flooded, and the septic system was backed up.

38. Plaintiffs hired a company to empty the septic, and the same company cleaned and sucked any standing water left. At the same time, the Plaintiffs took off baseboards and cut drywall.

39. It took approximately a week for the water to recede.

40. At some point, a County Code employee placed two traffic cones where the water went over the roadway in front of their house.

41. Eventually, a County Code employee came by with a map and kept telling us that we were in a low area.

42. It took the Plaintiffs from February 16, 2025, to April 2, 2025, to repair and dry out the home.

43. Plaintiffs had to operate remediating fans 24 hours a day, resulting in an $800 electric bill.

44. Further, Plaintiffs did not have flood insurance because they were not in a flood zone.

45. This all took place during their twin daughters' senior year of high school.

46. Plaintiffs had to walk around the Property in slides, with dust everywhere, living in a construction zone for weeks.

47. The water in the front yard was tested and found to be contaminated with waste.

48. Plaintiffs installed the last baseboard on April 2, 2025.

49. Plaintiffs were exhausted mentally, physically, and financially from what they had gone through.

50. Four days after installing the last baseboard, the weather forecast called for large amounts of rain.

51. Plaintiffs evacuated their children from the home.

52. Plaintiffs put as much as they could up high and spent the night on the Property.

53. Mr. Lawson spent all night fighting the water, sump pumping, and creating dams.

54. At 3 am, the water crossed over Shahan Road from the swamp area and wrapped the Property quickly.

55. Plaintiffs, once again, had to leave the home they had worked so hard to build.

56. On April 6, 2025, the Property flooded a second time, and six inches of contaminated stormwater entered the Plaintiffs' home, above the Finished Floor Elevation of the home.

57. Plaintiffs spent the next week cleaning, throwing away damaged items, and ripping out the newly installed baseboards.

58. As a result of the April 6, 2025, flooding, the Plaintiffs' house and land were flooded with water contaminated by waste and had to be disinfected.

59. Cheatham County came by not long after the rain and put up traffic cones over the road where the water came over the road in front of the Property.

60. A few days after the flood, Plaintiffs received a message that an individual who had been a part of the repairs to the Sycamore Middle School, a school in the Cheatham County School District, baseball field wanted to speak with the Plaintiffs.
61. The Plaintiffs were informed that the baseball field had always flooded during heavy rains, including the dugouts.
62. Plaintiffs were provided with pictures of a previous time when the baseball field flooded.
63. Plaintiffs were told that the extensive repairs to the baseball field at Sycamore Middle School did not require a County permit because the Cheatham County School District is exempt from that requirement.
64. Plaintiffs were also told that, as a result of the repairs, which were completed in the Fall 2024, the excess water that once flooded the baseball field was now being dumped into the swamp across the street from the Plaintiffs' home.
65. The School District enlarged drainage infrastructure at Sycamore Middle School without detention facilities, increasing downstream discharge.
66. The first heavy rainfall after the repairs to the ballfield was in February 2026, and resulted in the Plaintiffs house flooding.
67. Plaintiffs began to investigate and discovered there was only one outlet through which the water from the swamp could exit, and that outlet was on their side of Shahan Road.
68. The Plaintiffs also discovered that the City approved approximately 100 homes across seven subdivisions within the basin without requiring stormwater detention.
69. Plaintiffs began to investigate further and began to believe that the school, the farm, the school bus maintenance facility, and new construction were causing the excess water in

7

Case 3:26-cv-00174    Document 1    Filed 02/17/26    Page 7 of 15 PageID #: 7

the swamp across from their Property to end up in their yard and in their house, during heavy rains.

70. The Plaintiffs moved to a condo during the repairs to their home.

71. Plaintiffs reached out to Mayor of Pleasantville, who directed the Plaintiffs to speak with the Cheatham County District's Board of Education.

72. Mr. Lawson went to the Cheatham County School District and was denied the opportunity to speak to someone with the School District.

73. Representatives of the School District informed Mr. Lawson that he would be contacted by an attorney.

74. Plaintiffs never heard from an attorney for the Cheatham County School District.

75. On or about April 10, 2025, the Plaintiffs' attended the Cheatham County Board of Education Meeting, to ask for help with flooding caused to their property.

76. Instead of offering help to the Plaintiffs, a deputy law enforcement officer was dispatched, and the Plaintiffs were informed that the Board would not allow them to speak.

77. Plaintiffs eventually communicated with Cheatham County's Emergency Management Agency ("EMA").

78. Through one of EMA's representatives, EMA, the Tennessee Emergency Management Agency ("TEMA"), and the Federal Emergency Management Agency ("FEMA"), visited the Plaintiffs.

79. EMA was going to help the Plaintiffs with their rent at the condo.

80. FEMA was doing an overview of county damage to get approved for federal funding.

81. Plaintiffs were told informally, by TEMA's representative, that the Property should not be underwater.

82. EMA still assured the Plaintiffs that it would help with the Plaintiffs' rent.

83. On or about April 22, 2026, the Plaintiffs were informed by EMA that it could not pay the Plaintiffs' condo rent because it was obvious that the Cheatham County School District caused the flooding of the Property.

84. According to EMA, the flooding of the Property was not caused by a natural disaster.

85. The Plaintiffs were stuck paying their mortgage and the rent for the condo.

86. No one has done anything to prevent the Property from flooding again.

87. The end of Plaintiffs' daughters' senior year will be remembered for the chaos, tears, and stress caused by the flooding to the Property, and not the joyous time of being proud and celebrating.

88. The Plaintiffs' daughters' senior party with family and friends was supposed to be at the Property, but the house was torn down to the studs, and mud covered the floors.

89. Defendants failed to: maintain culverts, ditches, and stormwater structures, enforce stormwater regulations; include the area in accurate flood mapping; warn Plaintiffs of known flood hazards; and prevent diversion or concentration of water onto Plaintiffs' property.

90. These acts and omissions, among others, caused recurring and foreseeable flooding.

91. Plaintiffs' home is now virtually unsellable due to recurring flood risk.

92. Despite actual knowledge of the flooding condition, Defendants have taken no corrective action.

93. Plaintiffs' Property remains subject to recurring and inevitable flooding during significant rain events.

## COUNT I

## FIFTH AND FOURTEENTH AMENDMENT TAKING

94. Plaintiffs incorporate all preceding paragraphs.

95. The Fifth Amendment, applicable to the states through the Fourteenth Amendment, prohibits the taking of private property for public use without just compensation.

96. Government-induced recurring flooding constitutes a compensable physical taking.

97. Defendants, through policies, approvals, and drainage modifications, artificially increased runoff and concentrated stormwater into the closed basin.

98. These actions caused recurring, foreseeable, and inevitable flooding of Plaintiffs' Property.

99. The flooding constitutes a permanent physical invasion and substantial impairment of Plaintiffs' property rights.

100. Defendants have not provided just compensation.

101. Plaintiffs are entitled to compensation pursuant to 42 U.S.C. § 1983.

## COUNT II

## SUBSTANTIVE DUE PROCESS – STATE-CREATED DANGER

102. Plaintiffs incorporate all preceding paragraphs.

103. The Fourteenth Amendment prohibits government actors from depriving individuals of property through arbitrary or conscience-shocking conduct.

104. Defendants did not merely fail to prevent natural flooding. Rather, Defendants affirmatively:

    a. Approved and permitted development within a closed drainage basin with no natural outlet;
    b. Enlarged and modified drainage infrastructure without requiring downstream detention;
    c. Allowed increased impervious surface runoff without cumulative basin analysis;
    d. Concentrated stormwater discharge into a single downstream outlet adjacent to Plaintiffs' Property.

105. Defendants had actual knowledge that these actions substantially increased the likelihood of downstream flooding.

106. Defendants had actual knowledge of recurring flooding in the basin, including roadway closures and historical flooding of nearby public facilities.

107. Despite actual knowledge of flooding caused to the Plaintiffs home on February 16, 2025, Defendants continued approving development and maintaining drainage practices that increased discharge into the basin.

108. Defendants' conduct created or substantially increased a specific risk of harm to Plaintiffs' Property.

109. Plaintiffs were a foreseeable and identifiable downstream victim of these drainage decisions.

110. Defendants acted with deliberate indifference to the known and obvious consequences of concentrating stormwater into a closed basin with a single outlet.

111. The repeated inundation of Plaintiffs' home with contaminated stormwater is not the result of ordinary negligence but of reckless disregard for downstream property rights.

112. Such conduct constitutes arbitrary governmental action that shocks the conscience and violates substantive due process.

113. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered repeated physical invasion of their home and deprivation of property rights.

## COUNT III

## MONELL LIABILITY

114. Plaintiffs incorporate all preceding paragraphs.

115. The constitutional violations described herein were not isolated acts of rogue employees but were caused by official policies, customs, practices, and decisions of the municipal Defendants.

116. At all relevant times, Defendants maintained and enforced policies and practices, including:

a. Approving residential and institutional development within a closed drainage basin without requiring cumulative downstream impact analysis;
b. Failing to require stormwater detention facilities for upstream development;
c. Allowing expansion or modification of public drainage infrastructure without downstream mitigation;
d. Failing to update or correct known drainage deficiencies despite repeated flooding;
e. Failing to warn property owners of documented historical flooding within the basin;
f. Issuing building permits and Certificates of Occupancy without evaluating basin capacity or downstream flood risk.

117. These policies and customs were longstanding and widespread and reflect deliberate choices by policymakers responsible for land-use approval, stormwater regulation, and public works.

118. Final policymakers for the County, City, and School District approved or ratified development and drainage decisions despite actual or constructive knowledge of recurring flooding conditions.

119. Defendants' failure to require detention or cumulative basin analysis constituted deliberate indifference to the constitutional rights of downstream property owners.

120. The continued approval of development and drainage modifications in a closed basin, with knowledge of roadway flooding and downstream inundation, demonstrates conscious disregard for predictable harm.

121. These policies, customs, and failures were the moving force behind the recurring flooding of Plaintiffs' Property.

122. After the February 16, 2025 flooding (and again after April 6, 2025), policymakers for each municipal Defendant were on notice and ratified the ongoing practices by refusing to implement detention/mitigation, refusing to correct discharge configurations, and continuing approvals that increased stormwater discharge into the basin.

123. As a direct result of these municipal policies and practices, Plaintiffs suffered a taking of property and deprivation of substantive due process rights.

## COUNT IV

## DECLARATORY AND INJUNCTIVE RELIEF

124. An actual controversy exists regarding the constitutionality of Defendants' drainage practices.

125. Plaintiffs seek a declaration that:

    a. Defendants' actions constitute an unconstitutional taking;
    b. Continued concentration of stormwater onto Plaintiffs' Property violates the Constitution.

126. Plaintiffs seek injunctive relief requiring:

- Implementation of corrective drainage measures;
- Cessation of increased stormwater discharge;
- Engineering review of basin capacity.

- Interim mitigation measures (detention/flow restrictions)
- Prohibition on additional basin-increasing approvals absent mitigation
- Schedule/reporting requirements

## CONTINUING CONSTITUTIONAL VIOLATION

127. Plaintiffs incorporate all preceding paragraphs.

128. The flooding of Plaintiffs' Property is not a single isolated event but the foreseeable and recurring result of Defendants' ongoing stormwater policies, approvals, and infrastructure configurations.

129. The drainage modifications and basin approvals remain in place and continue to concentrate stormwater toward Plaintiffs' Property.

130. Each significant rainfall event creates a renewed and continuing risk of physical invasion of Plaintiffs' home.

131. Defendants have taken no corrective action to mitigate the condition despite actual notice of the flooding.

132. The constitutional deprivation is ongoing in nature because:

    a. The altered drainage system remains operational;
    b. The basin remains without adequate detention;
    c. The risk of flooding remains present and inevitable.

133. Accordingly, Plaintiffs allege a continuing violation of the Fifth and Fourteenth Amendments.

134. The statute of limitations is satisfied because the unconstitutional conduct continues to inflict injury and threatens future harm.

## DAMAGES

135. Plaintiffs have suffered:

- Structural damage
- Loss of use
- Diminution in value
- Emotional distress
- Housing costs
- Expert expenses

136. Damages exceed $4,000,000.

## PRAYER FOR RELIEF

Plaintiffs request:

1. Compensatory damages;
2. Just compensation for the taking;
3. Injunctive relief;
4. Declaratory relief;
5. Attorney's fees under 42 U.S.C. § 1988;
6. Costs;
7. Such further relief as the Court deems just.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Respectfully Submitted,

By: /s/LeonardLucas
**Leonard E. Lucas III**
Tenn. BPR# 020184
315 Deaderick Street, Suite 1550
Nashville, TN 37238
615-953-4987 fax 629-203-7117
leonard.lucas@lellawfirm.com